**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

INDIIA MARING,

                                                    Plaintiff,

                    -against-

THE CITY OF ROCHESTER, a municipal entity, TYLER
COUCH, HENRY FAVOR, NASER ZENELOVIC,
RAYMOND DEARCOP, RALPH MONTINARELLI,
JOSEPH MORABITO, SAMUEL LUCYSHYN, "JOHN
DOE POLICE OFFICERS 1-200" (names and number of
whom are unknown at present), COUNTY OF MONROE,
TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES
1-200" (names and number of whom are unknown at present),
and other unidentified members of the Rochester Police
Department and Monroe County Sheriff's Office,

                                                    Defendants.

21-cv-6720 (FPG)

**SECOND AMENDED**
**COMPLAINT**
**[JURY TRIAL DEMANDED]**

        Plaintiff, by their attorneys, ROTH & ROTH, LLP and EASTON THOMPSON

KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.    **PARTIES**

        1.    Plaintiff INDIIA MARING (they/them) is a resident of the County of Monroe,

State of New York.

        2.    Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and

authorized under the laws of the State of New York. It is authorized by law to maintain a police

department, which acts as its agent in the area of law enforcement and for which it is ultimately

responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force

and the employment of police officers as said risks attach to the public consumers of the services

provided by the RPD.

        3.    Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation

duly organized and existing under and by virtue of the laws of the State of New York. Defendant

CITY maintains the City of Rochester Police Department, a duly authorized police department,

authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.     TYLER COUCH, "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS "1–200" (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.     Defendant HENRY C. FAVOR ("FAVOR") was, at all times relevant herein, Commander of the Special Operations Division ("SOD") of the RPD. In that role, he oversaw the Mobile Field Force ("MFF"). In his capacity as Commander of the SOD, he was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant FAVOR was responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

6.     Defendant NASER ZENELOVIC ("ZENELOVIC"), was, at all times relevant herein, a Captain with the RPD. Defendant Zenelovic is sued in his individual capacity. Zenelovic was one of the Incident Commanders on September 4, 2020.

7.     Defendant RAYMOND W. DEARCOP ("DEARCOP") is the Commander of the Special Operations Section ("SOS") of the RPD. At all relevant times herein, he was a Captain with the RPD assigned to the SOD. On September 4, 2020, DEARCOP was one of the Incident Commanders on on the scene. On September 5, 2020, DEARCOP was the Deputy Incident

Commander on the scene. As commander of the SOS, he oversaw the MFF and all its personnel and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant DEARCOP was responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

8.     Defendant RALPH MONTINARELLI ("MONTINARELLI"), at all relevant times herein, was a Lieutenant assigned to the SOC and the Tactical Unit ("TACT") of the RPD. Montinarelli was one of the Incident Commanders on September 4, 2020. Montinarelli was the Field Force Commander on September 5, 2020, where he oversaw all Mobile Field Force members on the ground. Defendant RALPH MONTINARELLI is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Montinarelli is sued in his individual capacity.

9.     Defendant JOSEPH MORABITO is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Morabito is sued in his individual capacity. Morabito was the Incident Commander on September 5, 2020.

10.     Defendant SAMUEL LUCYSHYN is or was at all relevant times a Lieutenant with the RPD and acting within the scope of his employment and under color of law. At all relevant times herein, LUCYSHYN was the Grenadier Team Leader. The Grenadier Team is a component of the MFF, comprised of selected members who are trained to deploy chemical munitions, and to utilize other crowd dispersal technology and techniques. As Grenadier Team Leader, Defendant LUCYSHYN oversaw the Grenadier Team and was responsible for all Grenadier Team matters, including the selection, ordering, purchase, and inventory of all

chemical weapons and/or "less lethal" weapons used by the Grenadier Team; and the appointment, training, supervision and conduct of Grenadier Team personnel. In addition, Defendant LUCYSHYN was responsible for enforcing the rules of the Grenadier Team and ensuring that Grenadier Team personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

11.    Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

12.    Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

13.    "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES "1–200" (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

14.    BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II.  JURISDICTION and VENUE

15.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343 over claims arising out of violations of the United States Constitution and 42 U.S.C.

§§ 1983 and 1985.

16.     The Court has pendent jurisdiction over plaintiff's state law claims pursuant to 28

U.S.C. §1367.

17.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New

York, the judicial district where the claims arose and in which the Defendants conduct business.

18.     Plaintiff filed timely Notices of Claim against the City and County, in compliance

with the Municipal Law § 50.

19.     The CITY and County each waived 50-h hearings.

20.     More than thirty (30) days have elapsed since service of said Notices of Claim

were filed and the City and County have failed to pay or adjust the claim.

21.     This action was brought within a year of the event that gives rise to Plaintiff's

causes of action under New York State law and Plaintiffs have complied with all of the statutory

prerequisites for bringing this action.

## III.  STATEMENT OF FACTS

### A.  Facts Common to All Causes of Action.

22.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police

Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call

for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an

RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the

scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared

brain dead that night; he was taken off life support and died on March 30.

23.    When the video of RPD Officers killing Daniel Prude was finally made public on

September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to

mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing

practices, and call for new visions of public safety that value Black lives.

24.    On September 2-6, 2020, the defendants responded to peaceful protests with

extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter

blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly

"less-than-lethal" munitions. Mx. MARING was assaulted and battered by RPD officers and

Sheriff's Deputies on September 2-6, 2020, as detailed below.

25.    Chemical weapons, like tear gas, are banned in warfare because they are

indiscriminate weapons by design, especially when deployed by firing a grenade or canister.

Chemical Weapons can cause severe injury or death, and, even at low concentrations, exposure

to tear gas presents a risk of serious, irreversible health effects.

26.    For Mx. MARING, exposure to the chemical weapons on September 2-6, 2020 by

Defendants caused menstrual irregularities that continue through today.

27.    RPD officers also assaulted and battered Mx. MARING on October 13, 2020 and

falsely arrested Mx. Maring on December 18, 2020, as detailed below.

**<u>Wednesday September 2, 2020</u>**

28.    On Wednesday September 2, 2020, After Joe Prude and Free the People

Rochester held a press conference releasing the Body Worn Camera video of RPD officers

brutally killing Daniel Prude, word spread and people assembled outside of the PSB. Meanwhile,

the City and RPD developed and implemented a strategy to silence this peaceful and lawful exercise of rights—this included calling in the State Troopers and Sheriff's Deputies to assemble a massive police presence. This coordinated strategy validated and encouraged the use of intimidation, excessive force, and illegal arrests by RPD officers during the protests.

29.     First, the RPD along with troopers and deputies erected barriers in front of the PSB and closed portions of Exchange Boulevard to vehicular traffic. As a peaceful demonstration took place, RPD officers pepper sprayed protesters and indiscriminately shot pepper balls into the crowd.

30.     When Mx. MARING arrived, Defendants had closed Exchange Street in front of the PSB to vehicular traffic.

31.     Mx. MARING was assaulted and battered by RPD officers and/or Sheriff's Deputies on Wednesday September 2, 2020, at a peaceful protest in front of the PSB.

32.     At approximately 5:00 p.m., Mx. MARING was present on the sidewalk in front of the PSB, and was not committing a crime or violation, or any act that a reasonably trained police officer could have believed provided justification for using any force against Mx. MARING whatsoever.

33.     Nevertheless, RPD Officers and/or Sheriff's Deputies shot Plaintiff with pepper balls and sprayed Mx. MARING with other chemical weapons, including pepper spray and/or tear gas, without cause or justification.

34.     The Incident commanders, who made all tactical decisions regarding the response to the protesters on September 2, 2020 were, upon information and belief, Defendants Morabito, Favor and Dearcop.

35.     As a result of the chemical weapons, being shot with pepper balls, and the other force used against them, Plaintiff suffered serious physical and emotional injuries and other damages, including menstrual irregularities.

**Thursday September 3 to Friday September 4, 2020**

36.     Plaintiff was again assaulted and battered by RPD officers and/or Sheriff's Deputies on the night of Thursday, September 3 to Friday September 4, 2020 at the peaceful protest in the vicinity of the PSB.

37.     When Mx. MARING arrived, Exchange Street in front of the PSB had been closed to vehicular traffic by Defendants.

38.     According to the New York Times: "People were sitting, singing, chanting, and eating pizza. At around 10:30 p.m., the dozen or so police officers who had been monitoring the demonstrators from behind a barricade were joined by around 20 reinforcements in riot gear. The officers suddenly surged toward the barricade and began firing an irritant into the crowd. It was unclear what led them to do so."

39.     At approximately 10:30 p.m., RPD officers pepper sprayed protesters and intentionally shot them with pepper balls. Officers also targeted and shot at journalists, legal observers, and people who were recording officers. RPD Officers also indiscriminately shot pepper balls into the crowd, without cause or legal justification.

40.     When the RPD officers and/or Sheriff's Deputies indiscriminately shot pepper balls into the crowd at approximately 10:30 p.m., Mx. MARING was standing in the vicinity of the sidewalk in front of the PSB and was shot with a KIPs or pepper ball.

41.    At no time prior to firing pepper balls and other chemical irritants into the crowd and then rushing at protesters did the RPD or any other law enforcement issue any dispersal orders.

42.    Thereafter, between approximately 10:30 p.m. to 11:30 p.m., in the vicinity of the street in front of the PSB, RPD officers and/or Sheriff's Deputies repeatedly subjected Mx. MARING to a large amount of chemicals from pepper spray and/or tear gas.

43.    At no time did Mx. MARING commit a crime or any act that justified the use of any force against them.

44.    The Incident Commanders, who made all tactical decisions regarding the response to the protesters on September 3-4, 2020 were, upon information and belief, Defendants MORABITO, MONTINARELLI and DEARCOP.

45.    Additionally, LUCYSHYN was on the ground on September 3, 2020, directing the police response and carrying out orders provided by the Incident Commanders over the radio.

46.    Upon information and belief, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, along with other policymakers for the City and RPD, developed the protest response plan for the night of September 3-4, 2020.

47.    Upon information and belief, MORABITO, MONTINARELLI and DEARCOP ordered that officers deploy pepper balls to "disperse" protesters on Exchange Boulevard to the south of the Center City bridge, at approximately 12:48-12:50 a.m. Upon information and belief, LUCYSHYN conveyed these orders to officers on the ground, including ROMANO or CLINKHAMMER or BACKUS, who all fired pepper balls at or in the direction of Amanda Flannery.

48.     After the protest on the night of September 3-4, 2020, and After Action Report was caused to be drafted by the Incident commanders. Upon information and belief, the After Action Report was reviewed, approved and ratified by the Incident Commanders and other policymakers for the City, including the Police Chief.

49.     As a result of the chemical weapons, being shot with pepper balls, and the other force used against them, Plaintiff suffered serious physical and emotional injuries and other damages, including menstrual irregularities.

**Friday September 4 to Saturday September 5, 2020**

50.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" hundreds of protesters, including Plaintiff, spray them with tear gas, and attack them with pepper balls – a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama.

51.     RPD officers first escorted peaceful protesters along Court Street from Martin Luther King Jr. Memorial Park towards the Public Safety Building ("PSB") and directed them onto the Court Street Bridge. But when protesters reached the other side, law enforcement stopped them with metal barricades.

52.     Defendants had closed the street to vehicular and pedestrian traffic.

53.     Defendants inhibited the freedom of movement of Plaintiff and other protesters by stopping them with metal barricades and trapping them on the bridge.

54.     After hundreds of protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." However, the dispersal orders were not clearly communicated, and the protesters towards the back of the bridge near South Avenue could not

hear the dispersal orders. Moreover, there was nowhere for the protesters in the front near the police barricades to go.

55.     When the RPD officers issued dispersal orders at on September 4 at approximately 10:43 p.m., Plaintiff was on the bridge.

56.     Less than 30 seconds after the "dispersal" orders were issued, suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law enforcement officers began violently attacking protesters. RPD Officers and Sheriff's Deputies fired hundreds of pepper balls at protesters, striking many in the head and face. Then they rushed at them, physically struck them with batons, and threw people to the ground.

57.     RPD Officers and/or Sheriff's Deputies shot Mx. MARING with pepper balls and subjected Plaintiff to large amounts of chemical weapons.

58.     Thereafter, after Defendants forcibly pushed Plaintiff and other protesters off the bridge, on September 5, 2020 at approximately 12:30 a.m., in the vicinity of Court Street near the Court Street Parking Garage, Plaintiff was subjected to large amounts of tear gas.

59.     At no time did Mx. MARING commit a crime or any act that justified the use of any force against them.

60.     The Incident Commanders, who made all tactical decisions regarding the response to the protesters on September 4-5, 2020 were, upon information and belief, Defendants FAVOR, ZENELOVIC, MONTINARELLI and DEARCOP.

61.     Additionally, LUCYSHYN was on the ground on September 4-5, 2020, directing the police response and carrying out orders provided by the Incident Commanders over the radio.

Lucyshyn also directed the use and deployment of various chemical weapons, including weapons known to contain chemicals that cause harm to the reproductive system and birth defects.

62.     Upon information and belief, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, along with other policymakers for the City and RPD, developed the protest response plan for the night of September 4-5, 2020.

63.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP, along with other City policymakers, devised the plan to erect metal barricades on the West Side of the Court Street Bridge, knowing this would cause protesters to become trapped on the bridge with no method to safely escape or comply with police orders to disperse.

64.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered officers to deploy pepperballs and CS gas at protesters who were trapped on the bridge, and then to charge at protesters and push and strike them with batons.

65.     After the protest on the night of September 4-5, 2020, an After Action Report was caused to be drafted by the Incident commanders. Upon information and belief, the After Action Report was reviewed, approved and ratified by the Incident Commanders and other policymakers for the City, including the Police Chief.

66.     As a result of the chemical weapons, being shot with pepper balls, and the other force used against them, Plaintiff suffered serious physical and emotional injuries and other damages, including menstrual irregularities.

**Night of Saturday September 5 to Sunday September 6, 2020**

67.     On the night of Saturday, September 5-6, 2020, Plaintiff attended the peaceful protest in downtown Rochester.

68.     Plaintiff was again assaulted and battered by RPD officers and/or Sheriff's Deputies on the night of Saturday September 5-6, 2020, at the peaceful protest in downtown Rochester.

69.     Police escorted protesters as they marched on the City's streets, until they approached the intersection of Broad Street and Exchange Boulevard.

70.     Defendants had closed the intersection of Broad Street and Exchange Boulevard to vehicular and pedestrian traffic prior to Plaintiff and other protesters approaching that intersection.

71.     When Plaintiff and other protesters approached the intersection of Broad Street and Exchange Boulevard, they were met with an overwhelming presence of RPD officers, Sheriff's deputies and State Police in full riot gear with military grade weapons—including a bearcat tank—and police dogs.

72.     Plaintiff and the other protesters were stopped at the intersection of Broad Street and Exchange Blvd. by Defendants, who prohibited their freedom of movement at the intersection.

73.     On September 5, 2020, at approximately 10:30 p.m., the RPD Officers and Sheriff's Deputies kettled and trapped Plaintiff and hundreds of other protesters at the intersection of Broad Street and Exchange Blvd.

74.     The RPD Officers and Sheriff's Deputies attacked Plaintiff and the other protesters with chemical weapons.

75.     On September 5 at approximately 10:30 p.m. at the intersection of Broad Street and Exchange Blvd, RPD officers and/or Sheriff's Deputies subjected to large amounts of tear gas and other chemical weapons and attacked Plaintiff with the LRAD and flash bang grenades.

76.     At no time did Mx. MARING commit a crime or any act that justified the use of any force against them.

77.     The Incident Commanders, who made all tactical decisions regarding the response to the protesters on September 5-6, 2020 were, upon information and belief, Defendants FAVOR, MORABIDO, MONTINARELLI and DEARCOP.

78.     Additionally, LUCYSHYN was on the ground on September 5-6, 2020, directing the police response and carrying out orders provided by the Incident Commanders over the radio. Lucyshyn also directed the use and deployment of various chemical weapons, including weapons known to contain chemicals that cause harm to the reproductive system and birth defects.

79.     Upon information and belief, FAVOR, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, along with other policymakers for the City and RPD, developed the protest response plan for the night of September 5-6, 2020.

80.     Upon information and belief, FAVOR, MORABITO, MONTINARELLI, DEARCOP and LUCYSHN, devised the plan to erect metal barricades at the intersection of Exchange Boulevard and Broad Street, knowing this would cause protesters to become trapped at this intersection with no method to safely escape or comply with police orders to disperse.

81.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered officers to deploy pepperballs, CS gas, and other chemical weapons and "less lethal" weapons at protesters who were trapped at the intersection of Broad Street and Exchange Boulevard, and then to charge at protesters and push and strike them with batons.

82.     Upon information and belief, FAVOR, ZENELOVIC, MONTINARELLI, LUCYSHN and DEARCOP ordered the use of tactics, chemical weapons and other "less lethal" weapons against "groups" of protesters in an indiscriminate manner.

83.     After the protest on the night of September 5-6, 2020, an After Action Report was caused to be drafted by the Incident commanders. Upon information and belief, the After Action Report was reviewed, approved and ratified by the Incident Commanders and other policymakers for the City, including the Police Chief.

84.     As a result of the chemical weapons, LRAD, flash bang grenades, and other force used against them, Plaintiff suffered serious physical and emotional injuries and other damages, including menstrual irregularities.

**<u>October 13, 2020</u>**

85.     October 13, 2020, Mx. MARING and several other individuals went to the PSB to inquire about their friend, Nicholas Wilt, who had been falsely arrested and was being detained on a mistaken warrant.

86.     At approximately 8:30 p.m., inside of the PSB, while peacefully attempting to ask the RPD for information, RPD officers demanded Mx. MARING and the other individuals leave, without cause or justification, as it is a public building.

87.     Without providing time for Mx. MARING and others to comply with the orders and leave the building, RPD officers issued an order to "just push them".

88.     Mx. MARING was pushed by one or more officers, pinned to a wall near the door, repeatedly pushed and shoved, causing Plaintiff to fall to the ground and hit their head.

89.     Thereafter, after Plaintiff exited the PSB and was standing outside, an RPD officer hit them in the hand with a baton, without cause or justification.

90.     At no time did Mx. MARING commit a crime or any act that justified the use of any force against them.

91.     As a result of the force used against them, Plaintiff suffered an injury to their head, and serious physical and emotional injuries and other damages.

**<u>December 18, 2020</u>**

92.     On December 18, 2020, a group of approximately 20 protesters held a demonstration at 87 Glasgow Street, Rochester, New York to object to the unjust eviction of a single mother and her three children who lived there in the middle of the winter during the pandemic.

93.     When Mx. MARING heard that the RPD was attempting to evict a single mother and her three children, they decided to go to the location to provide support and document and record the police activities.

94.     Mx. MARING arrived in the vicinity of 87 Glasgow Street, at approximately 6:45 p.m.

95.     When Plaintiff arrived, approximately 20 protesters were standing in the front yard at 87 Glasgow Street holding signs and chanting.

96.     Mx. MARING never stepped onto the property at 87 Glasgow Street.

97.     When Mx. MARING arrived, COUCH and approximately 20 other RPD officers in full riot gear were assembled in the street in front of 87 Glasgow Street.

98.     Mx. MARING stood alone on the sidewalk in front of a neighboring property and video recorded the police response to the protesters with their cell phone.

99.     Mx. MARING filmed the officers from a safe distance of no less than 10 feet away, and never interfered with the officers—physically or otherwise.

100.    Suddenly, without warning or justification, RPD officers, including but not limited to TYLER COUCH, unlawfully seized and falsely arrested Mx. MARING.

101.    Defendants lacked without reasonable or probable cause to believe that Mx. MARING was committing any crime or violation.

102.    Mx. MARING was seized and arrested while standing on a public sidewalk.

103.    Mx. MARING was seized and arrested in retaliation for filming RPD officers performing their duties in a public place.

104.    At no time was Mx. MARING committing any crime or violation.

105.    No reasonable officer would have believed that they had reasonable or probable cause to seize or arrest Mx. MARING for any crime or violation.

106.    Other "John Doe" RPD officers failed to intervene to prevent COUCH's unlawful seizure and false arrest of Mx. MARING.

107.    TYLER COUCH fabricated official police paperwork and falsely claimed that Plaintiff "physically interfere[d]" with the RPD's attempt to arrest "multiple other individuals at the above location."

108.    TYLER COUCH fabricated official police paperwork, which falsely claimed that Plaintiff "congregate[d] with multiple individuals and intentionally bar[red] access to 57 Glasgow Street".

109.    The false paperwork was forwarded to the District Attorney to initiate Mx. MARING's malicious prosecution malicious prosecution for violation of Penal Law § 195.05.

110.    All the false charges levied against Mx. MARING were dismissed in their entirety at the first court appearance on or about February 11, 2021.

111.    Upon information and belief, the charges against Mx. MARING were dismissed because the police paperwork failed to allege all elements of Penal Law § 195.05, and because the videos demonstrated that COUCH's allegations in the police paperwork were false.

112.    The criminal charges were dismissed in a manner indicative of Mx. MARING's innocence.

113.    Mx. MARING did not violate Penal Law § 195.05, and did not commit any other crime or violation.

114.    At no time did Mx. MARING commit any act that a reasonable and properly trained police officer could have believed provided them with reasonable or probable cause to seize and arrest them for violation of Penal Law § 195.05 or any other crime.

115.    On September 1, 2021, the City of Rochester, through its director of communications, Justin Roj, admitted that, "there has been a legacy in the Rochester Police Department of untruthfulness."

B.    **The Effects of Teargas and Other Chemical Weapons Was Known Prior to the September 2020 Protests**.

116.    After George Floyd was murdered on May 25, 2020, racial justice protests took place in cities across the county. Numerous police departments responded by using teargas and other chemical weapons against protesters.

117.    Immediately, protesters across the country reported that exposure to teargas and other chemical weapons caused menstrual irregularities.

118.    Throughout the summer of 2020, media outlets nationwide reported that protesters who were exposed to teargas and other chemical weapons were experiencing irregularities with their menstrual cycle. *See, e.g.*, Katie C. Reilly, *Police tear gas George Floyd protests despite proof it's dangerous. Time for a ban*, NBC News (June 11, 2020),

https://www.nbcnews.com/think/opinion/police-tear-gas-george-floyd-protests-despite-proof-it-s-ncna1229516 (noting that, tear gas "has been linked to miscarriages"); Jennifer Gerson, *Doctors Explain What You Should Know About Tear Gas & Your Period,* Bustle (June 17, 2020), https://www.bustle.com/p/can-tear-gas-affect-your-period-doctors-explain-what-to-know-22987529; Nicole Wetsman, *There isn't enough research to know if tear gas causes early periods: it's dangerous regardless*, The Verge (June 22, 2020), https://www.theverge.com/2020/6/22/21295159/tear-gas-menstural-cycle-miscarriage-period-protests; Dhruvi Chauhan, Paula Kibuka Musoke, and Goleen Samari, *Using tear gas on protesters perpetuates patterns of reproductive harm*, The Hill (June 26, 2020), https://thehill.com/opinion/healthcare/504699-using-tear-gas-on-protesters-perpetuates-patterns-of-reproductive-harm; Cecilia Nowell, *Protesters Say Tear Gas Caused Them to Get Their Period Multiple Times in a Month*, Teen Vogue (July 2, 2020), https://www.teenvogue.com/story/protestors-say-tear-gas-caused-early-menstruation; Alexandria Herr, Can tear gas mess with your period? Grist (Jul. 17, 2020), https://grist.org/justice/can-tear-gas-mess-with-your-period/; Rebecca Ellis, *'It's like they're testing it on us': Portland protesters say tear gas has caused irregularities with their periods*, OPB (July 29, 2020), https://www.opb.org/article/2020/07/29/tear-gas-period-menstrual-cycle-portland/. *Police are using tear gas, but lack of study and oversight raises health concerns,* Associated Press (Aug. 6, 2020), https://www.oregonlive.com/news/2020/08/police-are-using-tear-gas-but-lack-of-study-and-oversight-raises-health-concerns.html; Abe Asher, *Irregular Periods and Horrible Headaches: How Tear Gas Is Making Portland Sick*, VICE (Aug. 14, 2020), https://www.vice.com/en/article/4ay5mn/an-endless-barrage-of-tear-gas-is-making-portland-sick; Catherine Ryan Gregory, *Tear Gaslighting: Is There a Link Between Protesting and*

*Messed Up Periods?* Marie Claire (Aug. 21, 2020), https://www.marieclaire.com/health-fitness/a33648135/tear-gas-effects-reproductive-system/.

119.    Thus, for months prior to the September 2020 protests, Defendants had clear notice that the use of teargas and other chemical weapons causes damage to women's reproductive health, including menstrual irregularities and miscarriages.

120.    Defendant LUCYSHYN chose various chemical weapons that were used on plaintiff and other protesters. The chemical weapons he chose contained toxic chemicals such as lead, which is known to cause birth defects and reproductive harms.

121.    In fact, many of the various products that Defendant LUCYSHYN chose to use against Plaintiff and other protesters in September 2020 had a warning directly on the product and on the product's website that states:

> **"WARNING: This product can expose you to chemicals including Lead Salts and Hexavalent Chromium, which are known to the State of California to cause cancer, and Lead Salts, which are known to the State of California to cause birth defects.**

122.    Nevertheless, Defendant LUCYSHYN ignored these warnings and used these chemical weapons, despite having actual knowledge that they could cause birth defects and other reproductive harms.

Defendants ignored these warnings and decided to attack Plaintiff and other protesters with tear gas and other chemical weapons.

C.    **Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

123.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released.

124.    From the very beginning, the City and RPD officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. City and RPD officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

125.    This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

126.    During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

127.    The violations of Mx. MARING's rights are attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and

external, related to its unconstitutional policing of similar peaceful protests and peaceful demonstrations.

128.    Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

129.    Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

130.    According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

131.    The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 4-5, 2020 specifically.

132.    Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

133.    Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Mx. MARING.

134.    Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

135.    However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

136.    For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

137.    Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

138.    Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students

to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

139.    Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including

information gleaned from reports and lawsuits, as well as other data points, to identify

deficiencies in RPD training as it relates to constitutionally compliant protest policing.

140.     In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office

stated the police handled themselves appropriately.

141.     When questioned by public officials after the September 2020 protests, former

RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest

in developing the RPD's strategy for responding to protests in 2020.

142.     The City and RPD's failure to train and improper training led to widespread

excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos,

media reports, and RPD subject resistance reports.  However, Based on statements by City

Officials and RPD command staff to date, and publicly available information, no RPD officer

has reported any fellow officer for their unlawful use of force and no RPD officers have been

disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

143.     The City and RPD did not simply ratify excessive force through the lack of

reporting and discipline. It approved the force during the demonstrations because its policies

authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control

tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and

grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on

use for force. There appears to have been no consideration given to whether such force would be

excessive to secure compliance with traffic laws or enforce violations or misdemeanors against

nonviolent protestors.

144.     In summary, upon information and belief, the RPD's exclusive focus on deterring,

dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to

train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

D. **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

145.    Upon information and belief, for months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the COUNTY and BAXTER coordinated with the CITY and RPD to prepare for and plan their coordinated response to the anticipated large-scale protests when the video was eventually released.

146.    From the very beginning, the BAXTER and other COUNTY officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. Like the City and RPD officials, BAXTER and other COUNTY officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

147.    This manifested in the training of their Sheriff's Deputies, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing

nonviolent ones. The message to their Sheriff's Deputies was clear: there is no such thing as a peaceful protestor.

148.    Upon information and belief, during those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD coordinated with the COUNTY and BAXTER to develop a coordinated protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing

149.    Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

150.    The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

151.    The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

152.    Instead, the COUNTY and BAXTER, pursuant to the County's Hazard Mitigation Plan, trained Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

153.    Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

154.    Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

155.    Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

156.    According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of the COUNTY and BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

157.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful

demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

158.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

159.    Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

160.    Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

161.    In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

162.    BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

163.    As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

### IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
**Unlawful Seizure / False Arrest on December 18, 2020**
***Pursuant to New York State Law***
**(Against CITY, TYLER COUCH and other RPD OFFICERS)**

164.    All preceding and subsequent paragraphs are incorporated by reference.

165.    COUCH and other RPD officers, handcuffed and arrested Plaintiff on December 18, 2020.

166.    The arrest was made in the absence of a warrant for the arrest.

167.    The arrest was made in the absence of probable cause for the arrest.

168.    The Defendant RPD officers arrested Plaintiff without having exigent circumstances for doing so.

169.    There was no other authority for the arrest of Plaintiff.

170.    Plaintiff was conscious of the arrest.

171.    Plaintiff did not consent to the arrest.

172.    The RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

173.    The defendant RPD officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant City and the RPD, which are therefore responsible for their conduct.

174.    The Defendant City, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

175.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**SECOND CLAIM FOR RELIEF**
**Unlawful Seizure / False Arrest on December 18, 2020**
*Pursuant to 42 U.S.C. § 1983*
**(TYLER COUCH and other RPD OFFICERS)**

176.    All preceding and subsequent paragraphs are incorporated by reference.

177.    The COUCH and other RPD officers falsely arrested Mx. MARING on December 18, 2020.

178.    COUCH and the other RPD officers had no judicial warrant authorizing them to seize Mx. MARING on December 18, 2020.

179.    The RPD OFFICERS and other RPD officers seized Mx. MARING, restricting their freedom of movement, without privilege or lawful justification.

180.    Plaintiff was conscious of their confinements by Defendants.

181.    Plaintiff did not consent to being confined by Defendants.

182.    The RPD officers did not have reasonable or probable cause to seize, detain, or arrest Plaintiff.

183.    No reasonable officer would have believed they had reasonable or probable cause to seize, detain, or arrest Plaintiff.

184.    The RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

185.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**THIRD CLAIM FOR RELIEF**
**Evidence Fabrication / Denial Of Fair Trial Related to Arrest on December 18, 2020**
*Pursuant to 42 U.S.C. § 1983*
**(Against COUCH)**

186.    All preceding and subsequent paragraphs are incorporated by reference.

187.    COUCH deliberately fabricated information in  police reports and other arrest

paperwork on December 18, 2020 that they knew was likely to influence a jury's verdict,

forwarded that fabricated evidence to prosecutors, and Plaintiff suffered a deprivation of life,

liberty or property as a result.

188.    COUCH's actions violated Plaintiff's rights pursuant to the Fifth and Fourteenth

Amendments to the United States Constitution, to due process of law and to a fair trial, and as

such, they are liable to plaintiff under 42 U.S.C. § 1983, for compensatory and punitive damages.

189.    As a result of the above constitutionally impermissible conduct, Plaintiff was

caused to suffer economic injuries, violation of his civil rights, emotional distress, anguish,

anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damages to

their reputation and standing within the community.

190.    COUCH's actions were willful, malicious, oppressive, and/or reckless, and was of

such a nature that punitive damages should be imposed.

191.    As a result of the foregoing, Plaintiff suffered injuries and damages.


### FOURTH CLAIM FOR RELIEF
**Malicious Prosecution Related to Arrest on December 18, 2020**
*Pursuant to New York State Law*
**(Against CITY and COUCH)**

192.    All preceding and subsequent paragraphs are incorporated by reference.

193.    By the actions described above, the CITY and COUCH  jointly and severally,

acting in concert with each other and with additional persons for whose acts they are liable,

initiated, continued and/or caused the initiation or continuation of, criminal proceedings against

Plaintiff related to their unlawful arrest on December 18, 2020.

194.    By the actions described above, CITY and the RPD officers each violated good and accepted police practices.

195.    On or about February 11, 2021, the prosecution terminated in Plaintiff's favor.

196.    The termination of the criminal proceedings were indicative of Plaintiff's innocence.

197.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

198.    COUCH and the RPD officers acted with actual malice.

199.    The CITY and RPD employed the RPD officers, who were at all times agents, servants, and employees acting within the scope of their employment with the CITY and the RPD, which are therefore responsible for their conduct.

200.    The CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of respondeat superior.

201.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed.

202.    COUCH and the other RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

203.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## FIFTH CLAIM FOR RELIEF
**Malicious Prosecution Related to Arrest on December 18, 2020**
*Pursuant to 42 U.S.C. § 1983*
**(Against COUCH)**

204.    All preceding and subsequent paragraphs are incorporated by reference.

205.    The RPD Officers, acting individually and in concert, initiated the prosecution of

Plaintiff, despite knowing that probable cause did not exist to arrest and prosecute Plaintiff for

any crime related to their unlawful arrest on December 18, 2020.

206.    False and fabricated evidence was given by the RPD officers to the District

Attorney's Office.

207.    The RPD officers knew or were deliberately and recklessly indifferent to the truth

that probable cause did not exist to arrest and prosecute Plaintiff.

208.    There was actual malice and an absence of probable cause for the criminal

proceeding against Plaintiff and for each of the charges for which she was prosecuted.

209.    On or about February 11, 2021, the prosecution terminated in Plaintiff's favor.

210.    The termination of the criminal proceedings were indicative of Plaintiff's

innocence.

211.    As a direct and proximate result of the RPD officers' actions, Plaintiff was

wrongly prosecuted for approximately seven months and suffered the other grievous and

continuing injuries and damages as set forth above.

212.    COUCH and the other RPD officers' actions were willful, malicious, oppressive,

and/or reckless, and was of such a nature that punitive damages should be imposed.

213.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### SIXTH CLAIM FOR RELIEF
**Assault and Battery**
***Pursuant to New York State Law***
**(Against the CITY and Individual Defendants)**

214.    All preceding and subsequent paragraphs are incorporated by reference.

215.    RPD officers and/or Sheriff's Deputies battered Plaintiff on September 2-6, 2020 by subjecting Plaintiff to various chemical weapons, including shooting them with pepper balls, pepper spraying Plaintiff and subjecting Plaintiff to tear gas.

216.    RPD officers also battered Plaintiff on October 13, 2020 by repeatedly shoving Plaintiff, throwing Mx. MARING to the ground, and striking Plaintiff.

217.    COUCH and/or other RPD officers also battered Plaintiff on December 18, 2020 by handcuffing Plaintiff in an unreasonably tight manner and refusing to loosen the handcuffs, despite Mx. MARING's repeated requests.

218.    At no time did Plaintiff threaten any law enforcement officers or any other person.

219.    At no time was Plaintiff was committing any crime or violation.

220.    By the aforedescribed conduct, the RPD officers and/or Sheriff's Deputies, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff without their consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

221.    The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

222.    The Defendant CITY, as the employer of the individual RPD Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

223.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the Defendant RPD officers and Sheriff's Deputies against Plaintiff.

224.    The actions of the RPD officers and/or Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

225.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## SEVENTH CLAIM FOR RELIEF
### Excessive Force
### *Pursuant to 42 U.S.C. § 1983*
### (Against Individual Defendants)

226.    All preceding and subsequent paragraphs are incorporated by reference.

227.    The actions of the RPD Officers and/or Sheriff's Deputies towards Plaintiff on September 2-6, 2020 constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

228.    The actions of the RPD Officers towards Plaintiff on October 13, 2020 constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

229.    The actions of the RPD Officers towards Plaintiff on December 18, 2020 constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

230.    RPD Officers and/or Sheriff's Deputies used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

231.    It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to shoot Plaintiff with  pepper balls, pepper spray her, and subject Plaintiff to tear gas on September 2-6, 2020.

232.    The force used against Plaintiff on September 2-6, 2020 constitutes a seizure under the 4th Amendment.

233.    It was objectively unreasonable for the RPD Officers to repeatedly shove

Plaintiff, throwing Mx. MARING to the ground, and striking Plaintiff on October 13, 2020.

234.    The force used against Plaintiff on October 13, 2020 constitutes a seizure under

the 4th Amendment.

235.    The types and levels of force RPD Officers and/or Sheriff's Deputies used against

Plaintiff were in contravention of, or inconsistent with, related policies and/or training, and good

and accepted police practices.

236.    As a result of the acts and omissions of the RPD Officers and/or Sheriff's

Deputies, Plaintiff was deprived of Plaintiff's of federal, state, and/or other legal rights; Plaintiff

was caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or

humiliation; Plaintiff was caused to expend costs and expenses; and/or otherwise damaged and

injured Plaintiff.

237.    The actions of the RPD Officers and/or Sheriff's Deputies were willful,

malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be

imposed.

238.    As a result of the foregoing, Plaintiff suffered injuries and damages.


**EIGHTH CLAIM FOR RELIEF**
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***
**(Against All Defendants)**

239.    All preceding and subsequent paragraphs are incorporated by reference.

240.    In committing the acts and omissions complained of herein, Defendants acted

under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff

of the rights protected by the First Amendment to the United States Constitution on September 2-6, 2020; and the RPD officers additionally did so on October 13 and December 18, 2020.

241.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting Plaintiff to excessive force, in arresting and prosecuting plaintiff, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

242.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

243.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

244.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

245.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

246.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### NINTH CLAIM FOR RELIEF
### *Failure To Intervene Pursuant to 42 U.S.C. § 1983*
### (Against Individual Defendants)

247.    All preceding and subsequent paragraphs are incorporated by reference.

248.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of Plaintiff's constitutional rights by the other Defendant RPD Officers and/or Sheriff's Deputies on September 2-6, 2020.

249.    The individual defendant RPD officers also had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of their constitutional rights by the other Defendant RPD Officers on October 13 and December 18, 2020.

250.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

251.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

252.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

253.    Defendant RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

254.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## TENTH CLAIM FOR RELIEF
### Negligent Training, Supervision and Discipline
### (Against BAXTER)

255.    All preceding and subsequent paragraphs are incorporated by reference.

256.    Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

257.    Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

258.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

259.    BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

260.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**ELEVENTH CLAIM FOR RELIEF**
**Negligent Planning of the Protest Response**
**(Against BAXTER)**

261.    All preceding and subsequent paragraphs are incorporated by reference.

262.    Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

263.     BAXTER had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under the First Amendment to the United States Constitution, and Article I, section 8 of the New York State Constitution, were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

264.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are

a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

265.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that violated the rights to free speech, expression and to assemble.

266.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that conflated peaceful protests and demonstrations with violent mobs and riots; thus, BAXTER knew or should have known that in the absence of a proper protest response plan, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators, like Plaintiff.

267.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

268.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

269.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

270. BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

271. BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

272. Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

273. As a result of the foregoing, Plaintiff suffered injuries and damages.

**TWELFTH CLAIM FOR RELIEF**
**Negligent Planning of the Protest Response**
**(Against the CITY)**

274. All preceding and subsequent paragraphs are incorporated by reference.

275. The CITY and RPD were negligent in planning the response to the protests.

276. The CITY had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

277. For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included

responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

278.   The CITY and RPD breached its duty to Plaintiff and other protesters by failing to implement any plan whatsoever for how to ensure that RPD officers protected and promoted protesters rights to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

279.   The City and RPD breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of RPD officers that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

280.   The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that affirmatively violated protesters' rights to free speech, expression and to assemble under First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

281.    The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

282.    The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause protesters rights to free speech, expression and to assemble under the First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

283.    The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators and falsely arrest them.

284.    The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects—as same had been widely reported around the county in the months prior to the RPD's use of said chemical weapons in September 2020.

285.    The CITY breached his duty to keep demonstrators safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

286.    The CITY breached its duty to keep demonstrators safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

287.   The CITY breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

288.   The CITY breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

289.   The CITY breached his duty to keep demonstrators safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

290.   Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

291.   As a result of the foregoing, Plaintiff suffered injuries and damages.

### THIRTEENTH CLAIM FOR RELIEF
#### Municipal Liability
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights—Related to the RPD's Response to the Daniel Prude Protests***
**(Against the City)**

292.   All preceding and subsequent paragraphs are incorporated by reference.

293.   All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so

widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

294.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### FOURTEENTH CLAIM FOR RELIEF
#### Municipal Liability
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests***
**(Against the COUNTY and BAXTER)**

295.    All preceding and subsequent paragraphs are incorporated by reference.

296.    All of the wrongful acts or omissions complained of herein (other than the December 18, 2020 incident) against Plaintiff and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to

train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full

knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

297.    As a result of the foregoing, Plaintiff suffered injuries and damages.


### FIFTEENTH CLAIM FOR RELIEF:
#### Municipal Liability
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights—Related to the RPD's Policy, Practice and Custom of Retaliating Against Individuals Who Are Lawfully Recording Them Perform Their Duties in Public Places***
**(Against the City)**

298.    All preceding and subsequent paragraphs are incorporated by reference

299.    All of the wrongful acts or omissions complained of herein against Mx. MARING

were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal

policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant

CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so

widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned,

ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's

deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth

Amendments of the United States Constitution, as evidenced by the CITY's failures, and the

failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite

full knowledge of the their wrongful acts against Plaintiff, as described herein.

300.    The City and RPD maintain an unlawful policy, practice and/or custom of RPD

officers retaliating against individuals who are lawfully video recording them perform their

duties in a public place.

301.     The City and RPD maintain an interrelated unlawful policy, practice and custom of RPD officers making arrests in the absence of the commission of any crime by the person arrested, motivated by a desire to punish the arrestee for the arrestee's perceived failure to display the degree of deference or subservience demanded by the arresting officers.

302.     Such arrests are frequently referred to as **"contempt of cop"** arrests.

303.     In order to conceal the illegality of these arrests, the victim of the unlawful arrest is charged with a **"cover charge"**, usually a low-level crime which does not require a complaint, and whose elements can be established, for the purposes of a criminal complaint, by the officer's own perjured affidavit or testimony.

304.     RPD officers have a pattern and practice of charging one or more offenses as their favored cover charges: disorderly conduct, resisting arrest, or obstruction of governmental administration.

305.     The unlawful policy of retaliating against individuals who are lawfully video recording the RPD performing their duties in a public place can be inferred from the following incidents:

      a.  Emily Good was a victim of one such "contempt of cop" arrest on May 12, 2011. Ms. Good was standing on the front lawn of her home filming—from 10 to 15 feet away—RPD officers engaged in the traffic stop of a young Black man. RPD Officer Mario Masic noticed Ms. Good filming and ordered her back into her home, stating she seemed "anti-police" and he did not feel safe with her there. Ms. Good remained calm and stated she was only standing on her property and did not pose any threat. Masic responded that he'd had enough: "You know what? You're going to go to jail." He then trespassed

onto Ms. Good's property, unlawfully seized and handcuffed her, and forcibly led her to a squad car while she pleaded for him to explain why she was being arrested. A video of the unlawful arrest, incorporated by reference herein, can be found here: https://tinyurl.com/yff34jaw. Ms. Good was charged with "obstructing governmental administration" but the charges were later dropped. Though RPD's internal view concluded Masic should not have arrested Ms. Good for recording the traffic stop, then-Police Chief James Sheppard praised Masic for maintaining his "professional demeanor" in effecting the illegal arrest.

b.    On December 16, 2015, RPD Officer William Baker assaulted, battered and falsely arrested Shelise Colon in retaliation for her video recording Baker and RPD Officer Jason Kelly after they had stopped her boyfriend, Lawrence Barrett, on the sidewalk for no reason and pointed a TASER at him. The City settled the civil lawsuit brought by Colon and Barrett for $35,000.

c.    In July 2016, RPD officers targeted and arrested two black journalists at a Black Lives Matter protest in downtown Rochester. Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained by police, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Press colleagues who were there described RPD ignoring white reporters standing right next to Ms. Cleare and Mr. Carter and instead targeting the two Black journalists.

d.    On May 27, 2018, at approximately 1:30 a.m., RPD Officer Michael Stephens assaulted, battered and falsely arrested Anthony Hall and Shamell Killings

when they were lawfully recording him assault and batter their friend Craig

Puritt on a public sidewalk on Monroe Avenue in the vicinity of Meigs Street.

The City settled the civil lawsuit brought by Hall, Killings and Puritt for

$175,000.

e.   On December 18, 2019, RPD Officers Dakota Vanbrederode and Ethan

Paszko assaulted, battered and falsely arrested Dynasty Buggs in retaliation

for her attempting to film them during a traffic stop. After Ms. Buggs pulled

over, Vanbrederode approached the driver's side and ordered Ms. Buggs to

exit the car without lawful justification. When Buggs objected and tried to

record what was happening on her phone, Vanbrederode grabbed her phone

and threw it. He then pepper sprayed her in the face while she was still in the

car. After, Vanbrederode forcibly removed Ms. Buggs from the car, placed

handcuffs on her wrists, and pepper sprayed her again after she was

handcuffed. Vanbrederode falsely charged Ms. Buggs with obstruction of

governmental administration; all charges were dropped at her first court

appearance.

f.   In June 2020, Tobias Massey was falsely arrested, assaulted and battered in

retaliation for recording RPD officers violently arresting a man in his front

yard. Mr. Massey was woken up at night  by the sound of screaming from his

front yard, where three RPD officers were on top of a Black man, who was

crying that he could not breathe and did not want to die. Mr. Massey went

outside to record the event. When the RPD officers noticed he was recording,

they chased him into his home, wrestled him down, handcuffed and arrested

him. Mr. Massey was taken to the emergency room because of injuries he sustained from the encounter, where the officers gave him an appearance ticket charging him with resisting arrest and obstructing governmental administration for filming the police. After reviewing the video, former Chief Singletary dropped the charges against Mr. Massey.

g.   Emily McIntyre was falsely arrested by RPD officer Stephen Boily and other RPD officers on August 2, 2020 at approximately 12:00 a.m. in the vicinity of East Avenue and Alexander Street in retaliation for filming an RPD officer who was arresting a Black man in front of a bar called Murphy's Law. The officers falsely charged her with a violation of the Mayor's unlawful curfew, even though she was not congregated with any other person, let alone five or more people as required to be arrested under the "curfew." All the false charges were dismissed in their entirety on January 19, 2021.

h.   At protests in the City of Rochester following the release of the video of RPD officers killing Daniel Prude, photojournalist Reynaldo DeGuzman was repeatedly targeted and shot with pepper balls and other chemical weapons in retaliation for video recording officers performing their duties in public. On September 3, 2020, RPD officers shot DeGuzman in the neck in retaliation for him filming RPD officers violently arrest another protester named Jamia McCuller. Thereafter, on September 4, 2020, while videorecording RPD officers respond to peaceful protesters on the Court Street Bridge, RPD officers repeatedly targeted him and shot his camera equipment, disabling his

camera equipment and preventing him from filming and documenting the law
enforcement response to the protests for the remainder of the night.

i.   Another woman named Devorah Chatman was also shot numerous times with
pepper balls by RPD officers on September 3, 2020 in retaliation for
attempting to video record RPD officers violently arrest Jamia McCuller.

j.   On September 3, 2020, RPD officers targeted and shot *Democrat & Chronicle*
photographer Tina MacIntyre-Yee in the head as she was video recording
officers respond to protesters in the vicinity of the Public Safety Building. The
video of that incident, incorporated herein, is available at
https://tinyurl.com/2hy52d5d.

k.   On December 18, 2020, Assemblyman Demond Meeks was falsely arrested in
retaliation for filming RPD officers who were preparing to effectuate an
eviction of a mother and her three children in the middle of the pandemic at
87 Glasgow Street, Rochester, New York, which is within the 137th Assembly
District for which Assemblyman Meeks serves. Like Mx. MARING,
Assemblyman Meeks was not interfering with the RPD officers in any way,
physical or otherwise, but was seized, arrested, and falsely charged with
violations of PL § 190.05. Like Mx. MARING, all the false charges were
eventually dismissed on February 11, 2021.

306.   Additionally, upon information and belief, there are numerous other cases that are
not listed that the City and RPD know about where RPD officers unlawfully retaliated against
people for lawfully filming them perform their official duties in public.

307.    Another quintessential example of a contempt-of-cop/cover charge false arrest is detailed in another case settled by the City, *Redd* v. *City, et al*., 15-CV-6049-DGL-JWF (W.D.N.Y. 2014).

308.    In *Redd*, on November 27, 2013, RPD Officer Eliud Rodriguez arrested the 16-year-old plaintiff and two of his Edison Tech Varsity Basketball teammates[1] as they waited at the bus stop in downtown Rochester, NY, which was designated by City of Rochester officials and employees as the bus stop for all Rochester City School District sports teams. Officer Rodriguez arrested Mr. Redd and his two teammates in retaliation for their failure to adequately comply with his unlawful order to "move along" when the three student-athletes attempted to explain they were waiting for their school bus. Officer Rodriguez and other RPD officers lied in official police paperwork and charged Mr. Redd and his two teammates with Disorderly Conduct, despite knowing they lacked probable cause to do so. Approximately ten (10) days after the false arrest, the Monroe County District Attorney dropped all of the false criminal charges levied against Mr. Redd and his two teammates.

309.    As detailed in the complaint in *Redd* v. *City, et al.*, in the summer of 2014, the United States Department of Justice, including the Federal Bureau of Investigation (FBI) and the United States Attorneys' Office for the Western District of New York, conducted an investigation to determine whether federal criminal charges should be brought against RPD Officer Eliud Rodriguez for his unlawful conduct.

310.    Despite being aware of these cases, and paying at least hundreds of thousands of dollars to settle cases where RPD officers unlawfully retaliated against citizens for filming them

---

[1] Mr. Redd received $30,000 to settle his claims with the City of Rochester, and his two co-arrestees / teammates, Weathers and Carelock, accepted settlements in the amount of $10,000 prior to filing civil rights lawsuits in court.

perform their duties in public, the City and RPD apparently have not taken any actions to ensure that their officers are properly trained on the rights of people to film them perform their duties in public.

311. Similarly, the City and RPD apparently have not taken any actions to ensure that RPD officers understand the law regarding probable cause to arrest an individual for the crimes of obstruction of governmental administration, disorderly conduct, harassment and other common "cover charges" that are frequently levied against individuals, in the absence of probable cause to believe they actually committed any crime.

312. Upon information and belief, Defendant CITY and the RPD have refused calls for disclosure of statistics concerning minor offenses such as the "cover charge" crimes.

313. Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by Rochester Police Officers are disorderly conduct, resisting arrest, obstruction of governmental administration, trespass and harassment.

314. Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, trespass and harassment are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interaction.

315. Upon information and belief, Defendant CITY has been, and continues to be, aware of the prevalence of the problem of officers of the RPD making baseless "contempt of cop" arrests, and bringing false "cover charges" against the arrestees, but has failed to take action to remedy the problem.

316. Upon information and belief, to date the Defendant CITY has not implemented any particular training, oversight measures or policies designed or intended to curtail the

improper use by RPD Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, trespass and harassment.

317.    Upon information and belief, to date the Defendant CITY has not implemented any particular or remedial training, oversight measures or policies designed or intended to curtail the longstanding and widespread practice of RPD officers of retaliating against individuals for lawfully recording them perform their official duties in public places.

318.    COUCH and the other RPD officers were acting pursuant to the custom, practice, and/or policy of subjecting individuals to "contempt of cop" arrests when the seized and arrested Mx. MARING in retaliation for him video recording them perform their duties in a public place.

319.    The RPD's practice of tolerating and condoning its officers retaliate against individuals for lawfully video recording them performing their duties in public caused COUCH and the other RPD officers to unlawfully seize, assault, batter and falsely arrest Mx. MARING.

320.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## SIXTEENTH CLAIM FOR RELIEF:
### *Violation of New York Right to Monitor Act*
### *New York Civil Rights Law § 79-p*
### (Against the City, COUCH and RPD officers)

321.    All preceding and subsequent paragraphs are incorporated by reference

322.    Prior to being assaulted, battered and arrested, Mx. MARING was exercising their rights under New York Civil Rights Law § 79-p, the New Yorker's Right to Monitor Act, to record law enforcement activity and to maintain custody and control over the recordings he had taken.

323.    Prior to being assaulted, battered and falsely arrested, Mx. MARING had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

324.    COUCH and other RPD officers assaulted, battered and falsely arrested Mx. MARING, intentionally preventing them from further recording law enforcement activity.

325.    The RPD officers lacked reasonable or probable cause to stop, seize or arrest Mx. MARING for obstruction of governmental administration or any other crime.

326.    The RPD Officers were at all times agents, servants, and employees acting under color of law and within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

327.    All of the wrongful acts or omissions complained of herein against Mx. MARING were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiff's rights secured by the Article I, Sections 6 and 8 of the New York State Constitution and the First Amendment to the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff, as described herein.

328.    The City and RPD maintain an unlawful policy, practice and/or custom of RPD officers retaliating against individuals who are lawfully video recording them perform their duties in a public place.

329.    COUCH and the other RPD officers were acting pursuant to the custom, practice, and/or policy of subjecting individuals to "contempt of cop" arrests when the seized and arrested Mx. Maring in retaliation for them video recording officers perform their duties in a public place.

330.    The RPD's practice of tolerating and condoning its officers retaliate against individuals for lawfully video recording them performing their duties in public caused COUCH and the other RPD officers to unlawfully seize and falsely arrest Mx. Maring.

331.    As a result, Mx. Maring demands appropriate declaratory and injunctive relief under New York Civil Rights Law § 79-p(3)(d).

332.    The Defendant CITY, as the employer of the individual RPD Officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

333.    Defendant RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

334.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**SEVENTEETH CLAIM FOR RELIEF**
*Supervisory Liability Under 42 U.S.C. § 1983*
**(Against FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI, MORABITO and LUCYSHYN)**

335.    All preceding and subsequent paragraphs are incorporated by reference.

336.    As Commander of the SOD of the RPD, FAVOR oversaw the MFF, and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel.

337.    FAVOR personally caused Plaintiff's constitutional injuries by failing to properly train MFF personnel, as described herein; and by failing to appropriately supervise and discipline MFF personnel who violated departmental policy (such as by shooting pepper balls at head level), who engaged in unlawful conduct and/or who violated the rights of Plaintiffs and other protesters.

338.    Upon information and belief, Morabito, Favor and Dearcop were the Incidnet Commanders on September 2, 2020. In that role, they oversaw the RPD and the joint protest response on that day, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

339.    Morabito, Montinarelli and Dearcop were the Incident Commanders on September 3-4, 2020. In that role, they oversaw the RPD and the joint protest response on that night, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

340.    Favor, Zenelovic, Dearcop and Montinarelli were the Incident Commanders on September 4-5, 2020. In that role, they oversaw the RPD and the joint protest response on that night, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

341.    Morabito, Dearcop and Montinarelli were the Incident Commanders on September 5-6, 2020. In that role, they oversaw the RPD and the joint protest response on that night, and ordered the use of specific tactics and weapons, which caused Plaintiffs' injuries and damages, as described herein.

342.    Lucyshyn was the Grenadier Team Leader at all times relevant herein. In that role, he chose the various chemical weapons and other "less-lethal" weapons that were used against Plaintiffs and other protesters in September and October, 2020. He also oversaw the training,

supervision and discipline of all Grenadier Team members. As such, he was personally involved in causing the injuries sustained by Plaintiffs, as described herein.

343.    Because of the foregoing, Plaintiff sustained, *inter alia*, physical pain, permanent physical injuries, mental injuries, emotional distress, embarrassment, humiliation, loss of standing in the community, adverse employment consequences, loss of liberty, and deprivation of his common law and constitutional rights, and seeks compensation in an amount to be determined at trial.

344.    As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

345.    Defendants committed the foregoing violations of Plaintiffs' rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiffs' constitutional rights or to the effect of such misconduct upon Plaintiffs' constitutional rights.

346.    By reason of the foregoing, the Defendants are liable to Plaintiffs, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**WHEREFORE** and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.    Empanel a jury;

b.    Award compensatory and punitive damages;

c.    Appropriate injunctive and declaratory relief pursuant to New York Civil Rights Law § 79-p(3)(d);

d.    The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts,

except that the punitive damages demands are, as a matter of law, not

recoverable against a municipality and therefore are not made against the City;

e.      Award costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

f.      Such other and further relief as the court may deem just and proper.

Dated: New York, New York              Respectfully Submitted,
         September 21, 2023
                                        ROTH & ROTH, LLP.


                                              ~//s//~

                                        _____
                                        Elliot Dolby Shields
                                        Co-counsel for Plaintiffs
                                        192 Lexington Avenue, Suite 802
                                        New York, New York 10024
                                        (212) 425-1020

                                        Easton Thompson Kasperek Shiffrin LLP
                                        Donald Thompson
                                        Co-counsel for Plaintiffs
                                        16 West Main Street, Suite 243
                                        Rochester, New York 14614
                                        Ph: (585) 423-8290